FILED
2019 Jul-23  PM 02:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GEORGE GOODWIN,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | _____ |
| **THE LINCOLN NATIONAL LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## COMPLAINT

Plaintiff George Goodwin ("Plaintiff") brings this action for violations of the Employee Retirement Income Security Act of 1974 committed by The Lincoln National Life Insurance Company ("Lincoln") in connection with the provision of ERISA-governed disability benefits under a group insurance plan sponsored by Plaintiff's former employer, Centralite Systems, Inc.  In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge as to himself and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys:

1

## INTRODUCTORY STATEMENT

1.     This is an action for legal and equitable relief seeking redress of violations of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA").   This suit is brought pursuant to 29 U.S.C. § 1132(a) to secure disability benefits due to Plaintiff through the group insurance policies sponsored by Centralite Systems, Inc.

2.     The Plaintiff seeks all benefits to which he may be entitled should this Court determine he is "disabled," including short-term and long-term disability benefits under policies issued or administered and underwritten by Lincoln.

3.     Plaintiff seeks such benefits together with any other disability-related benefits his plan may provide based on the conditions documented in his medical records.   These conditions include type 1 diabetes, diabetic polyneuropathy, diabetic retinopathy, brachial neuritis, small fiber neuropathy, cervical degenerative disc disease, and other problems.

4.     Mr. Goodwin's confirmed symptoms include neuropathy accompanied by pain and numbness in his arms and legs, increased pain with movement, weakness, poor balance, muscle spasms and cramping, and blind spots in both eyes that prevent him from being able to read after a short period before he experiences nausea and headaches.

2

5.    Since late 2018, his vision has also prevented him from be able to safely operate a motor vehicle over significant distances where the strain and fatigue associated with blind spots quickly degrade that ability.

6.    The results of these conditions according to his medical records and two independent medical examinations, including one which occurred most recently this past May after Lincoln requested such to occur, include significant impairments affecting cognition and concentration and resulting also in a significant loss of mobility, visual distortions and "blind spots" in his eyes from retinopathy, and other complications that prevent him from being able to maintain a fulltime work schedule as an IT Director.

7.    Plaintiff's condition, which stems from small-fiber neuropathy, is one that involves frequent flares of severe pain resulting in an overall inability to function in a typical work setting in any capacity.

8.    Plaintiff's retinopathy is also significantly disabling on its own because it prevents Plaintiff from being able to use computer screens for any significant length of time.

## JURISDICTION

9.    Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" and/or an

"employee pension plan" as those terms are defined within 29 U.S.C. § 1001, <u>et.</u> <u>seq.</u> The Plan "may be found" within this district.

10.  Jurisdiction is further appropriate under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties.

11.  Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the employee welfare benefit plan at issue was at least partly administered in this District and Defendant may be found or resides in this District.

## **PARTIES**

12.  Plaintiff George Goodwin is a participant in the Plan and thus entitled to benefits available thereunder.

13.  Defendant The Lincoln National Life Insurance Company ("Lincoln") is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

14.  Lincoln is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

15.  One of Lincoln's designated agent for service of process is:

The Lincoln National Life Insurance Company
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

16.     Lincoln is an entity exercising authority or control respecting the management or disposition of Plan assets or the personnel exercising said authority over Plan assets.

17.     Lincoln is an entity providing services to The Plans at issue.

18.     Lincoln is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

## THE PLAN

19.     The Centralite Systems Inc. STD and LTD Plans are funded entirely by short-term and long-term group insurance policies sold by Lincoln, the company which also underwrote this group policy.

20.     These group policies were purchased by Plaintiff's employer to confer certain benefits upon Plaintiff and other employees.

21.     As a result, these policies qualify as employee welfare benefit plans as defined in 29 U.S.C. § 1002(1), and Plaintiff qualifies as a participant and/or beneficiary under the Plans as that term is used in 29 U.S.C. § 1132.

22.     Under the terms of each of these Plans providing for certain benefits accruing upon the Plaintiff becoming disabled, Plaintiff is "disabled" as these Plans define that term.

23.     There are no Plan documents indicating that Lincoln has an enforceable grant of discretionary authority as Plan or Claims Administrator or that any express delegation has occurred for these Plans.

## LINCOLN'S LIABILITY

24.     Goodwin began working for Centralite in 2013 where he was named the IT Director, which for a company like Centralite was an extremely important position.

25.     Goodwin's job as IT Director at Centralite involved overseeing the routine maintenance and upgrades of personal computers and servers and service requests for in-house staff.

26.     This position was also responsible for the in-house IT network as to both its hardware and software.  As to hardware, Goodwin would install new machines and devices, run cords and cables, and maintain overall connectivity.  This involved going into crawlspaces to move or handle sometimes heavy or unwieldy equipment.

27.     For the rest of his worktime, he generally worked from a desktop at various sites depending on where he was needed.  He often had to interact with people face to face to accomplish his work, so mobility was essential.

28.     This position required Goodwin to have excellent communication and problem-solving skills, to be available at all hours, and to be able to work quickly

6

and accurately under often urgent circumstances.

29.    Centralite's official job description for IT Director set forth the following duties and physical work conditions:

**DUTIES:**

- Analyzes complex business needs presented by the user community and/or clients and recommends technical solutions.
- Ensures the consistency and maintainability of existing applications by creating, maintaining, and enforcing standards/procedures for implementing technical solutions.
- Directs operations in executing production tasks according to a documented schedule that meets or exceeds customer expectations.
- Produces detailed time line for each application release and implements effective project control by monitoring the progress of the software release and reporting the status.
- Directs and prioritizes the work load of subordinate personnel.
- Reviews all designs, code and unit test plans where applicable.
- Approves all business requirements prior to the technical solution.
- Participates on all hardware and software evaluations and maintains vendor contracts.
- Represents the IT function at customer review meeting when appropriate.
- Directs education programs for her/his staff.
- Perform liaison duties between users, operations, and programming personnel in the areas of systems design, modifications or trouble shooting.
- Performs salary administration and conducts interviews and makes recommendations for new hires, consultants and/or replacement personnel.
- Other duties as assigned.

**WORKING CONDITIONS:**

- Must possess mobility to work in a standard office setting and use standard office equipment, including a computer; vision to read printed materials and a computer screen; and hearing and speech to communicate in person, before groups and over the telephone.
- May have to work evenings or weekends to meet deadlines or solve unexpected technical problems.

30.    As with any IT Director position, this occupation further required superior cognition skills such as high-level problem solving and logic skills, organizational skills, attention to detail, strong writing and other communication skills, listening skills, and an aptitude for constant learning.

31.    In January 2015, Goodwin began experiencing numbness in his left arm

7

extending to his fingertips.  These issues worsened over the next several weeks until that March when it began to cause him significant pain.

32.     The pain continued to increase in the months that followed

33.     Around June of 2015, Goodwin experienced a sharp pain in his head while reading a work-related item and found himself unable to speak for a short period.  Doctors told him later that his blood pressure had spiked likely due to the pain he had been experiencing, which had since spread throughout his shoulder and the top left part of his back.

34.     Walking itself had become painful for Goodwin because it resulted in the movement of his left arm as he ambulated.  This eventually caused him to guard his left arm resulting in his gait changing, which in turn caused him to develop pain in his left leg.  Goodwin eventually could not walk without the assistance of a cane.

35.     Goodwin's pain continued to spread and worsen even more.  Although able to work through much of that pain in 2015, by 2016 the pain had grown so pronounced that he started having to take sick days and work from home as an accommodation.

36.     He quickly used not only all his sick time, but also all his vacation time, because of the absences caused by how much pain he experienced.  Over the course of 2016, Goodwin missed over two months of work cumulatively.

37.     In fact, Centralite eventually suggested to Goodwin that he apply for

disability in August of 2016. Goodwin resisted doing so and still tried to work through and around his pain and conditions.

38.     Centralite, which valued Goodwin as an employee, tried to accommodate him by hiring someone to assist him by doing those things that required Goodwin to be present at work and which could not be done from home.

39.     This continued for a few months, but eventually Goodwin had to miss so much worktime that even this generous accommodation was unsustainable.

40.     Making matters worse, Goodwin has also since developed a blind spot in both eyes related to labile diabetes, so now he has a visual impairment too.

41.     As 2017 approached, Goodwin's pain progressively worsened, extending by that time now into his right side.

42.     Goodwin's other problems progressed too. By the beginning of that year, his vision had declined to the point that he could no longer see the computer screen whether at work or at home. Sometimes this vision issue resolved, but on many days it did not.

43.     Goodwin's treatment and therapy records over this time chronicle his development of these conditions and their worsening.

44.     Goodwin first saw Dr. Peterson in June 2015 for the increased pain he had been experiencing in his arm and his losses of balance causing him to fall. He reported his pain being at its worst when he would stand or walk, and that relief came

when he was either sitting or reclined and therefore at rest. He also reported as having to miss work because of these things.

45.     Further, diagnostic studies including an MRI and a CT exam commissioned by Dr. Peterson's office revealed disc bulging at C6-7 with canal narrowing, degenerative changes at C3-4 causing foraminal stenosis, and cervical spondylosis.

46.     During this time, Goodwin briefly maintained a journal in connection with his treatments documenting what he was experiencing as an aid to his doctors in their search for some measure of relief for him. That journal documents in detail the pain Goodwin was experiencing and other losses of function, including when his symptoms occurred and what he had been doing at the time.

47.     His accounts of those several days is especially revealing of his struggles, where in contrast to what he had earlier reported to his doctor a few months earlier, now even the act of sitting had become painful at times. In other words, his conditions were worsening, consistent with what he reported in his sworn declaration also provided to Lincoln as part of his STD appeal.

48.     Goodwin's treatment and therapy records also documented his lack of improvement. Dr. Peterson, in fact, surmised at the time that Goodwin's symptoms involving the nerve issues in his left arm do not correlate with his CT and MRI scans.

49.     Goodwin saw a chiropractor to find relief. Those records show Mr.

Goodwin reporting the following at his July 7, 2015 appointment:

> Patient presents with left arm numbness and pain. Pain is rated as a 8/10. Pain comes and goes but is always there. Pt stated it depends on how he turns when he feels a sharp pain shooting down his arm. Always has a dull ache down left arm. Every now and then patient will have pain down is right arm. Pain has been ongoing for 3 weeks now. Patient initially thought he was having a stroke and went to ER and had test done. The ER ruled out patient having stroke. Pain has gotten slightly worse since pain began.

50.    Thereafter, Goodwin saw a chiropractor twice per week for over a month, and his pain reports persisted.

51.    In Goodwin's final appointment with this chiropractor, the chiropractor confirms Goodwin's report on his condition to be substantially unchanged, as follows:

> George sought treatment today, complaining of intermittent (25%-50%) sharp, dull, aching, burning, numbing, shooting, throbbing and tingling discomfort in the back of the left hand. He rated the intensity of discomfort, using a VAS, as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement. The discomfort was reported to decrease with rest.
>
> George also complained of intermittent (25%-50%) sharp, dull, aching, burning, numbing, shooting, throbbing and tingling discomfort in the back of the left elbow. He rated the intensity of discomfort, using a VAS, as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement. The discomfort was reported to decrease with rest.
>
> George also complained of intermittent (25%-50%) tingling, sharp, dull, aching, burning, numbing, shooting and throbbing discomfort in the back of the left shoulder. He rated the intensity of discomfort, using a VAS, as a level 6 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with movement. The discomfort was reported to decrease with rest.
>
> George also complained of intermittent (25%-50%) numbing and tingling discomfort in the back of the left hip. He rated the intensity of discomfort, using a VAS, as a level 5 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with prolonged sitting. The discomfort was reported to decrease with movement.

52.    Goodwin departed this treatment with a guarded and uncertain prognosis.

53.    On September 1, 2015, Goodwin underwent an initial evaluation for physical therapy where he reported the following problems, consistent with those

11

he indicated to Dr. Peterson and his chiropractor:

> Chief Complaint: Pain: Aggravating Factors: SQUEEZING TOOTHPASTE W LEFT HAND, TYPING- INC LEFT
> ARM TO HAND, MOVING POTS OFF STOVE, SITTING, WALKING, COUGHING, EXTREME MOVEMENT,
> AVOIDS RIDING MOTORCYCLE X 3 MONTHS DUE TO FEAR OF LEFT ARM GOING TO DO SOMETHING,
> TURNING LEFT, SOMETIMES COUGH/ SNEEZE, SOMETIMES TROUBLE GETTING TO SLEEP- USES 1
> PILLOW, FALLS ASLEEP AT DESK- MAY HAVE BEEN SLEEPWALKING PER PT REPORT- 4.5- 5 HOURS
> PER NIGHT IN THE BED, CARRYING GROCERIES UP STAIRS- GETS OFF BALANCE AND DIZZY

54. The physical therapist at that time was optimistic Mr. Goodwin's condition could be improved with work. But records show that optimism disappeared after several sessions.

55. On November 23, 2015, Goodwin saw Dr. Mohamed Kazamel for suspected neuropathy since Mr. Goodwin's condition did not seem related to spinal issues. These notes reflect Mr. Goodwin had been experiencing lesser symptoms for *years* that only just now had become significant enough warrant attention.

56. In this initial examination, Dr. Kazamel confirmed Mr. Goodwin's pain and numbness.

57. Dr. Mohamed suspected small fiber neuropathy based on Mr. Goodwin's presentation, but intended to evaluate Mr. Goodwin for neuropathy generally.

58. Diagnostic testing confirmed length dependent small fiber neuropathy in his left leg on January 5, 2016. In a subsequent examination, Dr. Mohamed opined that Goodwin's diabetes was at least partly involved. He recommended improved diabetic control and nerve blocks to help with the left sided pain when it became severe.

59.     Goodwin's issues continued as he then saw Dr. Otzas on April 26, 2016. Dr. Otzas confirmed Goodwin to have decreased sensation, reflexes, and tremors among other things at that appointment.

60.     Around this same time, Goodwin continued his chiropractic care, this time with West Mobile Chiropractic, PC, where the intransigence of his conditions was again documented.

61.     At Goodwin's next appointment with Dr. Otzas on August 29, 2016, Dr. Otzas found him to be an appropriate candidate for a referral to pain management since his treatments (including more chiropractic care) and medications were not offering him much relief.

62.     Dr. Otzas assessed Goodwin as continuing to have paresthesia, neuralgia, and small fiber sensory neuropathy.

63.     On October 5, 2016, Goodwin saw Dr. Clay Rainer at Coastal Neurological Institute per Dr. Otzas's request with the same reports as those provided to his other providers.

64.     Dr. Rainer's examination confirmed decreased sensation in Mr. Goodwin's left side and Goodwin's earlier diagnoses of neuralgia, polyneuropathy, and numbness paresthesia.   Dr. Rainer proposed the use of, among other things, a spinal stimulator to help Goodwin cope with his pain.

65.     Goodwin returned to his primary care physician Dr. Israel on October

20, 2016, who made the following, very telling observation:

> george remains very disabled but he has continued to work at the expense of his health. He is in pain all the time, if at home not up he can manage but not pleasantly and if he takes enought meds to help he cant work even from home ...Lyrica has worked in past but made him too drowsy and unaware to work and he doesnt want narcotics He has pushed his cybaita to max dose and it helps some but again not enough

66.     Dr. Otzas documents these issues again five days later as including leg cramps brought on by exertion, muscle cramps, disturbances in coordination, numbness, tremors and loss of balance.

67.     On November 2, 2016, Goodwin saw Dr. Rainer again for a worsening of his condition. His pain, which was now fully bilateral, had worsened, as had his experiences of numbness.

68.     Meanwhile Goodwin's diabetes continued impacting him.   Dr. Del Fierro's notes document neuropathy as being related to his diabetes, and also Goodwin's retinopathy. Mr. Goodwin's other issues are noted also in this record.

69.     Goodwin eventually ceased working for good in May 2017 and reluctantly applied for Centralite's STD benefit with Lincoln.

70.     On or about June 22, 2017, Lincoln approved Goodwin's STD benefit after finding him to satisfy the terms of Centralite's STD plan and began paying that benefit effective May 13, 2017.

71.     Centralite's STD plan at the time conditioned eligibility on whether a claimant is unable "due to Sickness or Injury, to perform each of the Main Duties of his or her Own Occupation."

72.     Four months into the STD claim, and after extending that benefit at least

once in the interim, Lincoln informed in a letter dated September 22, 2017 that it was terminating Goodwin's claim effective September 12, 2017 and ceasing payment beyond that date because it found he no longer met the foregoing term.

73.    Lincoln's decision to terminate after two earlier approvals functionally was a finding that Goodwin's medical condition had substantially improved since its earlier determination and that Mr. Goodwin had regained his health and level of function needed to go from not being able to perform "each" of his Main Duties to being able to perform *all* of them.

74.    Goodwin thereafter retained counsel, and through counsel, requested his ERISA Administrative Record, including Lincoln's claims procedures that the Department of Labor requires administrators to maintain to ensure accurate and consistent decision-making.

75.    Lincoln responded with documents it identified as being part of Goodwin's administrative record up to that point, but indicated it was unable to provide any written procedures and standards to counsel because it does not have any upon which it relies from claim to claim under the Plan.

76.    Goodwin, through counsel, appealed the denial of his STD benefit in a submission dated March 16, 2018.   This submission included additional and/or updated medical records from Goodwin's treating doctors, including a retina specialist who had seen Goodwin for blind spots Goodwin had developed that

prevented him from working with screens.

77.    Goodwin also submitted among other things Centralite's formal job description for its IT Director position; a declaration from Karen Swanson who was Centralite's Director of Finance and Human Resources; an Independent Medical Records Review from a physician Board-Certified in Occupational medicine; assessments and physician opinions documenting Goodwin's functional limitations, and a Functional Capacity Examination report.

78.    During this same time, Goodwin through counsel also initiated a claim for his LTD benefit under the Centralite LTD plan similarly administered by Lincoln.   This effort began with a letter to Lincoln dated February 15, 2018 indicating Goodwin's desire to begin that claim process.

79.    Lincoln's claims notes show the review of the STD appeal began almost immediately according to a claim note dated March 22, 2018.

80.    The appeal was sent for review by Lincoln's claims team not long after, which led to a "21-day letter" that we received that April from someone who identified herself as a nurse employed by Lincoln.

81.    The nurse who prepared the draft report attached with that letter reached conclusions directly contradicting Mr. Goodwin's treating physicians, including Dr. Israel.

82.    She also contradicted the report and findings of the Independent

16

Medical Reviewer, a Board-Certified physician, who reviewed the records for Goodwin and had issued his findings based on that review.

83.    She found "no untoward side effects" would accrue from Mr. Goodwin's pain medications and no functional impairments that would impact Mr. Goodwin.

84.    The letter with that report indicated an intent to provide Mr. Goodwin with 21 days to address its findings.

85.    Almost immediately following the receipt of this letter and initial report, Goodwin's Counsel sent a letter back to Lincoln asking for clarification as to what the nurse was intending to suggest or find in her report and how she reached those opinions.  Those questions were as follows:

> First, as to the conclusion section indicating an opinion that there is no functional impairment "beyond 9/1/2017," I want to be sure that I understand the date at which Lincoln is concluding Mr. Goodwin was no longer disabled.  The decision letter suggested that date to be September 12, 2017.  Does Lincoln consider Mr. Goodwin to be disabled from a medical and functional standpoint as of August 31, 2017?  If it does not, and there is an earlier date which Lincoln considers Mr. Goodwin to have been disabled, what is that date?

> Second, in light of Lincoln's initial determination of disability in June 2017, I understand this nurse review to be indicating that Lincoln believes Mr. Goodwin's condition to have improved in some way at least since that initial disability determination.  However, it is not clear to me from this review in what aspects this nurse consultant believes Mr. Goodwin to have sustained such improvement.  Please clarify the existing opinion as to where it is believed this medical or functional improvement has occurred and the documentation upon which that finding of improvement is predicated.

[***page break***]

17

Third, the review by your nurse consultant generally identifies much of the documentation reviewed and itemizes four additional items as "additional records". Please identify all the records that were made available for your nurse consultants review.

Fourth and finally, please provide the qualifications and/or CV for the nurse consultant who performed this review.

Given the short nature of the deadline provided by Lincoln to respond to this review, I would appreciate a response to these questions at your earliest convenience, but no later than the close of business this Friday, April 20th. Thank you very much and I look forward to hearing from you very soon.

86.   Lincoln never made any response to these questions even after an attempt was made to follow up on them.

87.   At the same time, to respond to the overall implication that this nurse reviewer did not believe there to be substantial support from Goodwin's doctors or the Independent Medical reviewer, additional submissions were sent to Lincoln.

88.   These submissions included specific responses from Dr. Israel addressing the Lincoln's nurse's criticisms of his findings originally submitted with Goodwin's appeal letter and a vocational review which went toward the totally erroneous and inaccurate determination by Lincoln as to what Mr. Goodwin's occupation was in its earlier decision.

89.   In that same letter, Counsel for Goodwin also informed Lincoln that additional time was needed to complete the response to its "21-day letter" and a request was made that Lincoln defer making a decision until the invited response to the nurse's review could be completed.

90.   On May 15, 2018, Goodwin then sent a determination from the

Department of Education indicating it had found him to be disabled such that his additional indebtedness on his student loans was discharged. This finding was significant because of what it represented: a determination by a neutral arbiter that Goodwin was totally and permanently disabled from working again in the national economy (which is a much stricter standard than that in Mr. Goodwin's STD and LTD plans with Lincoln).

91.     One week later, on May 21, 2018, Counsel for Goodwin received from Lincoln a letter delivered through the mail dated May 14, 2018 (but actually sent and postmarked May 1<u>6</u>) indicating that Lincoln had elected to move forward with its issuance of a decision on Goodwin's STD claim affirming its earlier decision based on the nurse review it had included in its letter one month earlier.

92.     That May 14th letter not only ignored the clarification questions asked several weeks before and the request for an additional short amount of time to complete a response to that nurse review, but in its body it also ignored entirely the evidence described above that it had received relevant to the claim.

93.     Counsel for Goodwin thereafter returned that same letter (and a copy of its postmark) to Lincoln in Bates-numbered form for confirmation as part of Goodwin's ongoing ERISA record and enclosed with it a report this time from an Independent Medical Examination to which Goodwin had submitted.

94.     This report addressed with great specificity the deficiencies found in

Lincoln's nurse paper-only review that Lincoln had since elevated without any explanation whatsoever as being determinative.

95. Almost simultaneously with our transmission of these submissions, Lincoln informed it was denying Mr. Goodwin's LTD claim based on the same reasoning set forth in its denial of his STD appeal earlier.

96. This LTD denial letter was therefore no better than the STD letter, because it _too_ ignored the evidence Goodwin submitted and failed even to attempt to distinguish any of it or explain why Lincoln elected to go with its own contradictory nurse review and fallacious vocational determination over the medical evidence. In fact, none of that information was even _mentioned_ in that letter, nor did Lincoln explain why the sworn statements of Mr. Goodwin and Ms. Swanson from Centralite were not assigned any weight.

97. Because Lincoln's denial was contrary to those sworn statements, Goodwin attempted to ascertain from Lincoln the foundation for its position because of the lack of sufficient explanation provided in this pair of determination letters. Goodwin, through Counsel, thereafter faxed a letter to Lincoln as to both decisions on June 7, 2018 where the following questions were asked:

> "1. Is it Lincoln's position that Mr. Goodwin is being dishonest when he says that he cannot work?
>
> "2. Is Lincoln accusing my client [Mr. Goodwin] of insurance fraud?

"3.    Is it Lincoln's contention that the doctors and experts who are supporting Mr. Goodwin's claim [are] colluding with him to commit insurance fraud?  Or are these doctors committing malpractice by failing to identify that he is a fraud as Lincoln appears to be contending?"

98.    It was also noted in that letter that Lincoln was contradicting Karen Swanson's sworn declaration, so Counsel asked also what grounds Lincoln had to imply that she had perjured herself in giving that declaration.

99.    As with the questions sent back in April, Lincoln never responded and never even communicated.  Far from engaging Goodwin in a "meaningful dialogue" as ERISA case law requires, the Lincoln STD appeals/LTD teams collectively had elected simply to "go dark" about its decision-making process.

100.    The ERISA Administrative Record covering this time period confirms Lincoln successfully received everything sent to it which it then failed to consider before deciding Goodwin's first-level STD appeal and LTD claim.

101.    The Record for this period also shows that the claims teams on these two matters, in concert, outwardly ignored these submissions and failed to consider them in their review process.

102.    It also shows that the persons responsible for these two decisions and processes had decided to ignore Goodwin and his Counsel altogether on *any* matter, including as to requests for additional information.

103.    In summary, Lincoln up to that point elected to keep Goodwin in the

dark about what was going on while racing to a determination based on a nurse-prepared document review that was totally at odds with actual doctors who treated or examined Goodwin in person.

104.   Pursuant to Plan terms, Goodwin appealed the LTD decision and asked that Lincoln review a second time the appeal that had been submitted for the STD decision.

105.   During the appeal process, Lincoln asked for and received additional information from Karen Swanson at Centralite confirming Goodwin's occupational responsibilities; Ms. Swanson's response was fully consistent with her declaration and with Goodwin's declaration too in how they described what his occupation involved on a week to week basis. Goodwin authorized this contact of Ms. Swanson at Lincoln's request.

106.   Lincoln, however, did not seek authorization on the more serious subject of his protected health information ("PHI"). Specifically, Lincoln, without authorization to do so, shared Goodwin's PHI with an outside company called Dane Street and an outside physician named Dr. Lucien Parrillo.

107.   Dr. Parrillo had a professional and legal obligation to ensure he was authorized to receive and review Goodwin's PHI before accessing it but failed to do so.

108.   This breach of HIPAA was not discovered by Goodwin until Dr.

Parrillo sent a letter to his Counsel dated August 21, 2018 in which he sought responses to certain questions he had posed about Goodwin's submission of medical evidence that he intended to direct to Goodwin's treating physicians (even though all such questions were squarely answered by the medical assessments Goodwin's treating physicians had provided).

109.    Upon learning of this unauthorized breach, Counsel for Goodwin sent a letter to Dr. Parrillo (with a copy to the Lincoln claims handler for the pending appeal) asking how he came into possession of Goodwin's PHI since all authorizations extended to Lincoln had long since been revoked.

110.    Again, neither Dr. Parrillo nor Lincoln responded to this inquiry and chose to ignore it.

111.    Instead, on September 6, 2018, less than 7 days after pretending to want answers from Goodwin's medical providers on certain questions, Dr. Parrillo completed his report which Lincoln sent on that date. As with the nurse review earlier that Spring, again Lincoln offered Goodwin 21 days to furnish a response and comment on its findings.

112.    Goodwin sent back to Lincoln a response from the Independent Medical Examination physician who had examined Goodwin for over an hour and a half that noted Dr. Parrillo was in no professional or objective position to comment on Goodwin's functionality, let alone contradict the findings of Goodwin's treating

physicians, without actual observation of him and interaction with him.

113.    Lincoln stayed the course in opposing Goodwin's benefit and on October 24, 2018 denied his STD and LTD appeals arguing there was no medical evidence or examination findings showing Goodwin remained disabled from working in his own occupation beyond September 11, 2017.

114.    This decision was the culmination of a rudderless and unprincipled process where in all respects the announced conclusions outwardly appear to have been predetermined.

115.    Upon receipt of this initial appeal decision, Goodwin, through Counsel, requested that he be provided with an updated copy of his ERISA administrative record pursuant to 29 C.F.R. § 2560.503-1(h)(2)(iii).

116.    Lincoln again did not produce several documents that it was obligated to provide during the claims process upon Goodwin's request.  These include:

    (a)    documents exchanged with or generated in the course of claims administration by entities hired in connection with the administration of Goodwin's benefits claim;

    (b)    documents relating to bonus and incentive compensation programs applicable to Goodwin's claims handlers; and

    (c)    documents sent to, received by, or created by Lincoln's legal department in connection with the administration of Goodwin's claim.

117.    Further, as to Goodwin's request for Lincoln's policies and procedures relating to its claims administration, Lincoln contended in its November 7, 2018 cover letter accompanying its production that it had none to provide other than those "listed in the LTD policy beginning with page 12 and in the STD policy beginning with page 17."

118.    Although having been excused from further pursuit of Plan remedies because of Lincoln's documented breaches of Plan terms and Department of Labor standards, Goodwin nevertheless lodged a second appeal with Lincoln on February 19, 2019 to address any potential defense Lincoln could have pursued at that time that he still had to exhaust his remedies notwithstanding these issues.

119.    In that second appeal letter, Goodwin identified the additional instances of unfair claims practices to which he had been subjected and again asked that his claim be reinstated.

120.    Ten days before its deadline for rendering a decision, Lincoln, through its vendor Network Medical Review ("NMR"), informed Goodwin that it wished for him to undergo another Independent Medical Exam, thus conceding that its

investigations throughout the previous year between three different reviews was substandard and, at least in its view at that point, incomplete.

121.   Lincoln's tardy scheduling of this examination is also in direct violation of 29 C.F.R. § 2560.503-1(h)(4).

122.   Despite having clear notice of Goodwin's advancing blindness and knowing Mr. Goodwin would not be able to make the journey, Lincoln sought to arrange for the examination to occur 300 miles from Mr. Goodwin's residence – a *very* significant drive even for someone who can see.

123.   Goodwin, through Counsel, sent a letter to Lincoln questioning the timing of the examination given Lincoln's decision deadline and the need for it given the prior IME that had taken place, and indicated he physically could not make that kind of journey requiring him to travel nearly 5 hours each way.

124.   On April 5, 2019, Lincoln's 45-day deadline for rendering a decision on Goodwin's claim expired without a valid and proper extension having been invoked.  At this point, Goodwin's appeal became deemed-denied by operation of law under Department of Labor regulations and governing precedents.

125.   Lincoln nevertheless continued to review the claim, despite it having exceeded its deadline and leaving the claim in a state of administrative denial under such Regulations, and in that regard, again scheduled an IME for Mr. Goodwin, but this time with a physician in Birmingham, Alabama.

126.   The physician assigned for the examination was Dr. Bruce Romeo, a selection that raised immediate concerns about Lincoln's intentions toward Goodwin and its treatment of his claim.

127.   Dr. Romeo is well-known for his bias against disability and worker's compensation claimants and in favor of insurance companies that pay him regularly to perform reviews of different kinds.

128.   As confirmed by declarations sent to Lincoln upon its selection of Dr. Romeo, Dr. Romeo's bias against claimants manifests itself in the assembly-line approach he employs when performing these exams for insurance-company clients, where he regularly passes each claimant down the line after spending less than ten minutes with them.

129.   Dr. Romeo himself lacks any credibility at all, and Lincoln's selection of him is highly questionable because he has been proven time and again to be a biased medical examiner.   He is notorious for conducting worker's compensation medical examinations, but only for insurance companies and never for the insured or a claimant.  Dr. Romeo is not a neutral, independent examiner, but an adversarial and biased examiner.

130.   In fact, the undersigned firm representing Mr. Goodwin in this matter is directly familiar with the fact that he has conducted examinations for Prudential,

Hartford, Cigna and AIG within the last year for its clients, and now with Lincoln as well.

131.   Counsel confirmed to Lincoln upon making this selection that it had videotape documenting the hostility he exhibited during an examination in the past.

132.   Counsel also confirmed having video of a previous examination where Dr. Romeo injured a client, causing a grown man to cry during his examination.

133.   Problems with Dr. Romeo in his conducting of such examinations are not isolated; they have attracted the attention of Courts, too. To advise Lincoln of this fact, Goodwin sent it a court order in which Jefferson County Circuit Court Judge Elizabeth French judge found that Dr. Romeo was not telling the truth.  Dr. Romeo contended that a treating doctor agreed with Dr. Romeo's summary of a course of treatment and that the injury was not caused in the workplace.  The treating doctor denied ever agreeing with Dr. Romeo and specifically did not believe that Dr. Romeo was telling the truth.

134.   Other concerns about Dr. Romeo's professionalism and fairness arise from Dr. Romeo's website, which notes that: "We provide Birmingham area business and industry with comprehensive occupational medicine services."  http://www.alabamacomp.com/ services/.

135. Furthermore Dr. Romeo has written an opinion article for *The Birmingham News* claiming that individuals seeking benefits due to injuries or

disabilities had a false sense of entitlement. His contention is that nearly all were not deserving – a clear indication of bias and pre-judgment toward all his examinees sent by his insurance-company clients.

136. Despite these concerns, Goodwin agreed to attend the examination, even though it had been requested out of time, in the event Lincoln might eventually reverse its procedural denial earlier that April and reinstate the claim on its own without the need for litigation.

137. Goodwin confirmed this agreement at Lincoln's request, and consistent with Dr. Romeo having allowed video-recordings of his examinations in the past (as indicated above), informed he would be attending with a representative present who would video-record the examination without interfering in any way with the examination itself.

138. Shortly before the examination was to take place, Lincoln informed Goodwin that it objected to him recording the examination and that it would not proceed with the examination on that basis.   Lincoln provided no basis for its objection, other than to indicate that it "does not permit third parties and/or recording devices in independent medical examinations."

139. The Centralite LTD plan, however, does not include any such prohibition, and Lincoln itself had informed Goodwin before that all its procedural policies and requirements are found in that Plan.   Lincoln's asserted basis for

objecting, therefore, was without substance or foundation in Plan documents or the procedures Lincoln informed Goodwin governed its handling of his claim.

140.  Lincoln then scheduled an examination with another NMR provider on May 7, 2019, but then declined unilaterally to go forward with that examination also, even though Mr. Goodwin said he would attend it too and that he would work to make himself available for it that day despite the short notice (six days) provided to him.

141.  In light of Lincoln's recent cancellations (the last of which was not explained), Goodwin undertook to arrange the requested IME in Lincoln's place. In anticipation of the examination, on May 10, 2019, Lincoln was asked to forward the questions it wanted the examiner to address, together with whatever records and information it wanted the examiner to consider relevant to those questions.

142.  Lincoln responded to the request relating to the IME on May 15, 2019, and in doing so, submitted two peer review reports it has since obtained for the examiner's consideration.  One report was from Dr. Krishna Padiyar and the other report was from Dr. Bradley Davitt.  These reports were based solely on reviews of certain records Lincoln provided to each.

143.  The IME went forward as scheduled on May 24, 2019.  The report that followed and which was provided to Lincoln confirmed again that Mr. Goodwin

was totally disabled by his small fiber neuropathy and his advancing march toward complete blindness due to his advanced diabetic retinopathy.

144.   The report also sharply criticized the "paper" reviews Lincoln provided for the examiner's consideration.

145.   At the same time the report was sent to Lincoln, Goodwin provided Lincoln with a detailed response to the two "paper" reviews that had been provided for this IME expressing alarm that both of the reviews outwardly indicated that Lincoln had failed to provide both Dr. Padiyar and Dr. Davitt with significant and arguably the most relevant of all the medical records and assessments Mr. Goodwin had previously sent to Lincoln to support his claim.

146.   Specifically, Lincoln withheld from these reviewers the following items, all of which were immensely significant to Goodwin's disability:

(a)   Dr. Israel's April 18, 2018 Statement   confirming his professional medical opinion that Mr. Goodwin has remained in constant pain since September 2017 and that he does not expect it to get better, that Mr. Goodwin's pain medications leave him groggy and with clouded sensorium, that Mr. Goodwin has balance, gait and physical weakness issues, and that Mr. Goodwin has worked well beyond when most would have had to stop working (a testament to the fact he is not an malingerer):

31

1. Did George Goodwin experience substantial medical improvement in his conditions between June 22, 2017 and September 1, 2017, such that he could return to fulltime employment in your opinion beyond that date?

NO — GEORGE HAS CONSTANT PAIN — HE MANAGES IT WITH LIFESTYLE AND MEDICINE THE MORE HE DOES THE MORE HE NEEDS PAIN MEDICINE WHICH HE CANNOT TAKE AND BE FUNCTIONAL AND HE WISHES (APPROPRIATE) TO AVOID DEPENDENCE

[***page break***]

2. Do the opinions and conclusions in the "Medical Opinion Form" you completed on February 12, 2018 (attached) also describe accurately your assessment of Mr. Goodwin's functionality to a reasonable degree of medical certainty going back to September 1, 2017? Stated differently, do your responses in your February 12, 2018 "Medical Opinion Form" describe Mr. Goodwin's consistent level of function from at least September 1, 2017 through the present?

YES AND I DO NOT EXPECT ANY CHANGES

3. Do Mr. Goodwin's prescription medications since June 2017 impact his functional ability to maintain pace, concentration and cognition in a regular fulltime (8-hour per day, 40 hours per week) work setting? If so, please explain this impact.

YES, IF HE TAKES HIS PAIN MEDICINE HE IS GROGGY AND HAS CLOUDED SENSORIUM

4. Additional comments or information for Mr. George Goodwin relating to his condition and functional limitations since June 2017:

GEORGE WORKED FOR YEARS WHEN MOST WOULD NOT HAVE AND PAST WORK HE WAS DISABLED HE IS CLEARLY DISABLED NOW

(b) Dr. Israel's June 5, 2017 Attending Physician Statement

reporting:

4. When did symptoms first appear or accident happen?
*1 - 2015*

5. Date you believe patient was unable to work?
*10-1-16*

6. Diagnosis (including complications)
*3-3-16 severe neuropathy*

7. Subjective symptoms
*severe pain*

8. Objective findings (including current x-rays, EKG's, laboratory data and any clinical findings)
*type 1 DM*
*Severe Neuropathy*

Height *5'10*

Weight *175*

9. List of Restrictions & Limitations
*He needs pain meds which affects his mental state*

10. Nature of treatment (including surgery and medications prescribed, if any)
*Cymbalta 60mg  lyrica 25 day Insulin 3 v.cutep*

(c)    Dr. Israel's June 13 Attending Physician Statement reporting:

4. When did symptoms first appear or accident happen?
*1/2015*

5. Date you believe patient was unable to work?
*5/5/17*

6. Diagnosis (including complications)
*DIABETIC NEUROPATHY*

7. Subjective symptoms
*SEVERE PAIN*

8. Objective findings (Including current x-rays, EKG's, laboratory data and any clinical findings)
*TYPE 1 DM*
*SEVERE NEUROPATHY*

Height *5'10"*

Weight *175*

9. List of Restrictions & Limitations
*HE NEEDS ANALGESICS WHICH AFFECT HIS MENTAL STATUS*

10. Nature of treatment (including surgery and medications prescribed, if any)
*CYMBALTA 60 MG   LYRICA 25 BID   VICTOZA*

11. Has patient ever had same or similar condition?  ☐ Yes ☒ No  If "Yes" provide dates.

12. Do you consider this condition to be due to your patient's employment?  ☐ Yes ☒ No

13. If pregnancy, estimated date of delivery.
    Actual date of delivery:

14. Date first treated

15. Date of last visit/treatment

[***]

18. Prognosis and Rehabilitation:

a. When do you think your patient will be able to return to work in their occupation?  *UNKNOWN*

b. When could trial employment commence?  ☐ Full-time  ☐ Part-time   *UNLIKELY TO RETURN*
Please submit clinical documentation to support your decision.

33

(d)     Dr. Israel's July 12, 2017 Attending Physician Statement

reporting:

4)  The patient has been continuously Totally Disabled (unable to perform regular job)
    From    5/5/17  to  ONGOING

    The patient has been continuously Partially Disabled (some restrictions or light duty)
    From _____ to _____.

    If the patient is still disabled, when should patient be able to return to work? _____

5)  Remarks or Comments:  SEVERE  NEUROPATHIC  PAIN  REQUIRING
    PAIN  MEDS  THAT  AFFECT  HIS  MENTAL  STATUS

6)  List Restrictions and Limitations:  UNABLE  TO  DO  ANY  WORK
    _____

7)  Physical Impairment:
    ☐ Class 1 - No limitation - capable of heavy work - No restrictions (0-10%)
    ☐ Class 2 - Medium manual activity (15-30%)
    ☐ Class 3 - Slight limitation of functional capacity, capable of light work (35-55%)
    ☐ Class 4 - Moderate limitation of functional capacity, capable of sedentary/clerical activity (60-70%)
    ☑ Class 5 - Severe limitation of functional capacity; incapable of minimum (sedentary) activity (75-100%)

8)  Mental Impairments (if applicable)
    ☐ Class 1 - Patient is able to function under stress and engage in personal relations (no limitations)
    ☒ Class 2 - Patient is able to function in most stress situations & engage in most interpersonal relations (slight limitation)
    ☐ Class 3 - Patient is able to engage in limited stress situations & limited interpersonal relations (moderate limitation)
    ☐ Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitation)
    ☐ Class 5 - Patient has significant loss of psychological, physiological, personal & social adjustment (severe limitations)

(e)     Dr. Israel September 7, 2017 Physical Abilities Assessment

reporting:

The patient has the following functional/limitations or restrictions:

| Lift/Carry | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) |
|---|---|---|---|---|
| 0 - 10 lbs. | | X | | |
| 11 - 20 lbs. | | X | | |
| 21 - 35 lbs. | X | | | |
| 36 - 50 lbs. | X | | | |
| 51 - 100 lbs. | X | | | |

| The patient may: | Never (0%) | Occasionally (1 - 33% of day) | Frequently (34 - 66% of day) | Constantly (67 - 100% of day) | |
|---|---|---|---|---|---|
| Sit | | | | X | |
| Stand | | X | | | |
| Walk | | X | | | |
| Climb | | X | | | |
| Bend | | X | | | |
| Kneel | X | | | | |
| Drive | | X | | | |
| Finger | | X | | | R / L / Both |
| Handle | | X | | | R / L / Both |
| Operate Foot Controls | | X | | | R / L / Both |
| Reach above the shoulder | | X | | | R / L / Both |

Are there environmental factors that the patient should avoid? ☒ Yes   ☐ No   Specify: _COLD  HEAT_
_EXTREMES_

     (f)     Mr. Goodwin's sworn declaration describing his struggles with working and experience with intense pain and the effects of his pain medications;

     (g)     Centralite CFO Karen Swanson's sworn declaration confirming Mr. Goodwin's accounts of his functionality and his unsuccessful effort to overcome the same;

     (h)     Sharon Collins RN's review of Mr. Goodwin's medical records and functional assessments as of Fall 2017:

Mr. Goodwin has been diagnosed with small fiber peripheral neuropathy affecting his left arm, hand and left leg. It is a type of peripheral neuropathy that occurs from damage to the small unmyelinated peripheral nerve fibers. This type of neuropathy is often due to diabetes or

[*** page break ***]

35

impaired glucose metabolism. Individuals with small fiber neuropathy cannot feel pain that is concentrated in a very small area, such as the prick of a pin. However, they have an increased sensitivity to pain in general and experience pain from stimulation that typically does not cause pain. People affected with this condition may also have a reduced ability to differentiate between hot and cold. The symptoms of small fiber sensory neuropathy include unusual sensations such as pins-and-needles, pricks, tingling, numbness, and pain. These abnormal sensations or impaired sensations are all called parasthesia. Continued nerve damage can also lead to muscle weakness. Mr. Goodwin's treatment notes demonstrate all the above symptoms.

Mr. Goodwin has diabetic retinopathy. Diabetic retinopathy is a diabetes complication that affects eyes. It's caused by damage to the blood vessels of the light-sensitive tissue at the back of the eye (retina). Complications of this condition can lead to serious vision problems.

To complicate matters, Mr. Goodwin has cervical disc disease. CT and MRI studies indicate he has bulging discs and spinal canal narrowing. This condition can cause radiating pain, numbness, and weakness into the affected limbs.

Brachial neuritis is a term used to describe an inflammation of the brachial plexus that causes sudden-onset shoulder and arm pain, followed by weakness and/or numbness. After the nerve roots leave the cervical spine, they combine to form the brachial plexus. The brachial plexus is a network of nerves that runs through the shoulder and down the arm. Inflammation of this network of sensitive nerves can cause sudden, severe pain. Mr. Goodwin has also been diagnosed with this condition.

Mr. Goodwin requires strong narcotic medication to control his pain symptoms that are worsened with physical activity. Drowsiness and impaired judgment often occur with these medicines.

A study on the impact of chronic pain on work performance published in "Eur J Pain" 2006 Feb; 10(2):161-6 by *Blyth FM, March LM, Nicholas MK, Cousins MJ. University of Sydney Pain Management and Research Centre, Royal North Shore Hospital, St Leonards, NSW, Australia* found that chronic pain not only caused an increase in absenteeism but effected work performance as well. The study concluded that chronic pain had a larger impact on work performance than has previously been recognized and was related to reduced performance while working with pain. Chronic pain often leads to increased medical expenses, lost income, and lost productivity. It may affect people to the point that they cannot work, eat properly, participate in physical activity, or enjoy life. Mr. Goodwin has described his pain in these terms.

In determining a person's ability to work full-time, all aspects of their medical conditions must be accounted for. Not only does Mr. Goodwin's medical conditions impact his ability to work it also affects his ability to carry out his daily activities of living. I find there is substantial corroborating medical evidence to warrant Mr. Goodwin's limitations and restrictions as stated by his treating physicians.

(i)     Mr. Goodwin's Determination Letter from the Appeals Council finding that despite being under 40 at the time of disability that Mr. Goodwin's conditions easily qualify for Social Security Disability based on the same evidence before Lincoln in this matter, but some of which Lincoln withheld from its recently-identified reviewing physicians:

36

The medical evidence of record documents the claimant's type I diabetes mellitus, small fiber peripheral neuropathy, and diabetic retinopathy. His elevated blood sugar; hypoglycemia; left upper extremity pain, numbness, and tingling; right upper extremity pain; bilateral lower extremity pain, numbness, and tingling; gait disturbance; bilateral eye blind spots; right eye scotoma; 20/40 best corrected visual acuity in the right eye; and difficulty recognizing and discerning text and other acute detail have been noted since the alleged onset date (Exhibits 7F, 9F, 14F, 18F, 19F, and 20F). He has been treated with insulin; a cane; and antidiabetic, sleep, and pain medications (Exhibits 7F, 11F, 18F, 19F, and 20F). The sedating side effects from his medications have been noted (Exhibits 11F, 14F, and 20F).

Residual functional capacity ordinarily is an assessment of the claimant's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, i.e., eight hours a day, for five days a week, or an equivalent work schedule (SSRs 96-8p and 96-9p). In order to perform a full range of sedentary work, an individual must be able to lift up to 10 pounds at a time and to occasionally lift or carry articles like docket files, ledgers, and small tools; stand and walk for a total of up to two hours during an eight-hour workday; and sit for a total of at least six hours during an eight-hour workday (20 CFR 404.1567(a) and SSR 96-9p).

In consideration of the claimant's impairments, he is unable to sustain even sedentary work on a regular and continuing basis. He is able to perform sedentary work except that visual impairment limits his ability to read text or see fine details, and he will be off task more than 20 percent of a workday due to a medical condition. These limitations accommodate the claimant's impairments.

(j)     Medical records from Dr. Pradat;

(k)     Medical records from Dr. Franklin spanning from December

20, 2018 through February 21. 2019;

(l)     Updated medical records from Dr. Israel dated through

February 18, 2019; and

(m)     Medical records from Dr. Del Fiero dated through February 7,

2019.

147.    Dr. Padiyar's review statement drew particular criticism from Dr.

Israel, who in a statement sent to Lincoln, confirmed that Dr. Padiyar had badly

misrepresented the contents of a telephone conversation Dr. Padiyar had initiated

with him in a way that favored Lincoln despite being contrary to the actual medical evidence and Dr. Israel's professional medical opinions.

148.   Dr. Israel also expressed alarm that Dr. Padiyar demonstrated near-complete unfamiliarity with diabetic neuropathy, to the point of confusing it with a condition Mr. Goodwin did <u>not</u> have (which conveniently also would not have been considered as serious).   Specifically, Dr. Padiyar described Goodwin's condition as being "neuralgia" instead, which is not the same as evidence in the ERISA administrative record explains.

149.   Dr. Israel also expressed incredulity at Dr. Padiyar's suggestion that there was no confirming evidence of Goodwin's diagnosis, in the face of clear evidence of that diagnosis being confirmed through a biopsy.

150.   Goodwin brought all of this to Lincoln's attention on May 29, 2019.

151.   On June 14, 2019, Lincoln confirmed Goodwin's claim would remain denied, citing addendum reports from Dr. Padiyar and Dr. Davitt that had never before been provided to Goodwin for response.   Had the claim not already been in a procedural deemed-denial status as of April 5, 2019, this sand-bagging by Lincoln would be an additional clear violation of Department of Labor regulation 29 C.F.R. § 2560.503-1(h)(4).

152. Goodwin, through Counsel, since has again requested that he be provided with an updated copy of his ERISA administrative record pursuant to 29

C.F.R. § 2560.503-1(h)(2)(iii). The production received continues to have the same omissions noted earlier in this Complaint.

153.   However, documents currently identified by Goodwin as being part of the ERISA Administrative Record (and thus bearing the Bates labeling convention "Goodwin [xxxx]"), establish numerous breaches and errors committed by Lincoln while administering Plaintiff's different claims, including:

(a)   The failure to maintain adequate claims procedures, or any procedures *at all*, in compliance with Department of Labor regulations;

(b)   The targeting of Plaintiff's claims for denial because ERISA governs;

(c)   The failure by Lincoln to take any meaningful measures to insulate its claims process from its inherent conflict under the Supreme Court case *Glenn v. MetLife* and instead allowing its profit motive to influence its claims administration for Plaintiff;

(d)   The withholding of relevant documents and information from Plaintiff throughout the claims process and depriving Plaintiff of the ability to obtain a full and fair review of his claim;

(e)     Taking an adversarial posture against Plaintiff instead of a fiduciary posture by searching for ways to avoid paying part or all his claim;

(f)     Failing to conduct an adequate investigation, and not considering and/or according proper weight to relevant, supportive information;

(g)     Failing to accord any weight to Plaintiff's medical providers and other examiners who personally examined the Plaintiff, some on a regular basis;

(h)     Failing to give proper consideration to Plaintiff's Social Security disability determination in accordance with Eleventh Circuit precedent;

(i)     Failing to adhere to the terms of the Plan, including as to the timely acceptance and processing of a claim for benefits;

(j)     Purposefully limiting and curtailing the review of its medical personnel and otherwise improperly exerting influence on them to opine against payment of benefits;

(k)     Unreasonably and arbitrarily overruling the professionals who personally examined Plaintiff and instead relying in peer review

reports over an IME, especially when one of those reports has glaring and obvious deficiencies;

(l)    Failing to give Plaintiff's claim a full co-morbid review and give any consideration to how his conditions impacted one another; and

(m)    Unreasonably and arbitrarily overruling *its own* prior determinations that Plaintiff was disabled without there being medical evidence of substantial medical improvement in Plaintiff's conditions.

154.    In addition to the foregoing issues, Lincoln also has further demonstrated a pattern of dishonest and illegal conduct through its reckless and/or intentional solicitation of HIPAA violations by misrepresenting to its third-party reviewers that Lincoln possessed a HIPAA authorization from Goodwin, when it plainly knew it did not. This occurred not just with Dr. Parillo as set forth above, but also subsequently – and in the exact same way – with Dr. Padiyar and Dr. Davitt.

155.    Despite Goodwin's established disability and entitlement to coverage under the terms of the STD and LTD Plans, Lincoln continues to refuse to consider Goodwin not to be "disabled" and thus unqualified for STD or LTD benefits.

156.    As set forth above in connection with Lincoln's fiduciary breaches, Lincoln's claim decision was the product of a conflict of interest whereby it allowed

its own financial interests to supersede its fiduciary obligations to Goodwin. Under *Glenn*, this presents an additional reason for application of a *de novo* standard to their claims decision.

157.   This conflict of interest further calls into question the credibility of Lincoln's claims personnel and reviewers who behaved dishonestly and who openly defied Plan terms, department of labor regulations, and federal privacy laws.

158.   Lincoln considered the applicability of ERISA before making its decision. This presents an additional reason for application of a *de novo* standard to their claim decision.

159.   Lincoln did not provide Plaintiff with a meaningful opportunity for a full and fair review of this claim for benefits as required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1, and instead actively tried to subvert Plaintiff's ability to protect his right to such a review.

160.   Lincoln's decision process did not comport with 29 U.S.C. § 1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with Department of Labor regulations. Here, Lincoln issued no such denial within the time required under the Plan, leaving it instead to be deemed-denied by operation of law on April 5, 2019.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff George Goodwin respectfully requests this court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a.    For an order awarding Plaintiff all benefits due and owing in accordance with the terms of the Plan and Policy, as well as all prejudgment interest due thereon as permitted by law and equitable principles, pursuant to 29 U.S.C. § 1132(a);

b.    For a judgment against the Defendant awarding Plaintiff all costs and reasonable attorney's fees incurred connected to the prosecution of and pursuit of relief in this action as permitted under 29 U.S.C. § 1132(g)(1);

c.    For an order requiring Defendant to provide Plaintiff with any additional benefits to which the Plaintiff would be entitled pursuant to a finding that the Plaintiff is disabled under The Plan(s);

d.    For an order enjoining Defendant, individually or through its agents, from obtaining PHI from Plaintiff's medical providers without a valid, HIPAA-compliant authorization being in effect; and

d.    Such other relief as may be deemed just and proper.

Respectfully submitted,

M. Clayborn Williams (ASB-9101-A43M)
Ariel S. Blocker (ASB-0090-Z92A)\G
**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402
Phone (205) 343-1771
Facsimile (205) 343-1781
clay@erisacase.com
ariel@erisacase.com

**Plaintiff's Address:**

George Goodwin
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendants' Address:**

The Lincoln National Life Insurance Company
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104